## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT HUNTINGTON

ANDREW STEWART, ASHLEY STEWART,
DINNER'S READY, INC., a West Virginia
corporation, d/b/a BRIDGE CAFE & BISTRO,

     Plaintiffs.


v.                            Civil Action No.  3:20-cv-00611

JAMES C. JUSTICE, II,
in his official capacity as Governor of
West Virginia, PUTNAM COUNTY
COMMISSION, a political subdivision
of the State of West Virginia, RICK
SNAMAN, an individual,

     Defendants.

## VERIFIED COMPLAINT SEEKING DAMAGES UNDER
## 42 U.S.C. 1983 AND DECLARATORY RELIEF AND INJUNCTION

This complaint, brought pursuant to 42 U.S.C. Section 1983, the First and Fourteenth

Amendments to the United States Constitution, as well as seeking declaratory and injunctive

relief, arises out of the West Virginia Governor's issuance of a "Stay at Home Order" and a face

mask "mandate" pursuant to his COVID-19 executive orders, as well as the Defendant Putnam

County Commission's retaliation against the Plaintiff's First Amendment rights on or about July

of 2020 in or about Putnam County, West Virginia, within the Southern District of West Virginia,

Huntington Division.

## JURISDICTION AND VENUE

Subject matter jurisdiction over the claims and causes of action asserted by Plaintiffs in

this action is conferred on this Court pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, 28 U.S.C.

§1331, 28 U.S.C. § 1343, 28 U.S.C. §§ 2201 and 2202, and other applicable law.

Venue in this District and division is proper pursuant to 28 U.S.C. §1391 and other applicable law, because this District is the location of residence of Defendant Hon. James C. Justice, II, as the duly elected Governor of West Virginia.

## PARTIES

1.      The Andrew Stewart and Ashley Stewart, are husband and wife, who reside in Hurricane, Putnam County, West Virginia. They own and operate the Bridge Cafe & Bistro, located in Hurricane, Putnam County, West Virginia, which is a trade name operated under Dinner's Ready, Inc., a West Virginia corporation, all of which resides and is located in Hurricane, Putnam County, West Virginia, within the Southern District of West Virginia.

2.      Defendant Hon. James C. Justice, II is the duly elected Governor of West Virginia. He is only named herein in his official capacity.

3.      Defendant Putnam County Commission ("PCC") is a political subdivision of the State of West Virginia, located within the Southern District of West Virginia.

4.      Defendant Rick Snaman is named herein as an individual who acted under color of law while employed as a "Registered Sanitarian," a.k.a. "Health Inspector," for the Putnam County Health Department, a subcomponent of the Putnam County Commission, having an address of 11878 Winfield Road, Winfield, West Virginia 25213.

## FACTS

5.      On March 16, 2020, Gov. Justice declared a "State of Emergency" under W. Va. Code § 15-5-6. In the proclamation, the Governor provided the following substantiation for his declaration of a "State of Emergency":

- On January 21, 2020, the Center for Disease Control and Prevention activated their Emergency Response Center and began responding to COVID-19;

- On March 2, 2020, the Governor declared a "State of Preparedness;"
- It is of the utmost importance that Cabinet Secretaries, Commissioners, and Directors throughout the state have the ability to take measures necessary to ensure the safety of citizens;
- The COVID-19 epidemic constitutes a disaster under W. Va. Code § 15-5-2;[1]
- COVID-19 has been deemed a pandemic by the World Health Organization and the President of the United States has declared a national emergency;
- It is in the best interest of the citizens of West Virginia that we are able to stand up emergency operation centers and allow boards and agencies to suspend certain rules that inhibit them from responding effectively.

6.      On March 16, 2020, Gov. Justice issued the "***Stay at Home Order***," via Executive Order 9-20, ordering West Virginia residents to stay at home, for "non-essential" businesses and operations to cease operations, for "essential" businesses to continue operations, and further dictating which businesses were "*essential*" under the Order. The Order likewise dictated which businesses were compelled by him to cease operations and close their doors. The Order directed that it would be "enforced by State and local law enforcement, and by state and location regulatory and/or licensing bodies to the extent possible under West Virginia law." It also directed that it, along with all prior executive orders related to COVID-19, would be effective "until terminated by subsequent executive order." *See* Executive Order 9-20.[2]

7.      On July 6, 2020, Gov. Justice announced a statewide indoor face covering requirement, announcing the same on a televised address, by posting on social media, and by issuing Executive Order No. 50-20.[3]

---

[1] Under W. Va. Code 15-5-2(h), "Disaster" means *the occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property resulting from any natural or terrorist or man-made cause, including weapons of mass destruction, fire, flood, earthquake, wind, snow, storm, chemical or oil spill or other water or soil contamination, epidemic, air contamination, blight, drought, infestation or other public calamity requiring emergency action.*

[2] *See* Executive Order 9-20, attached as Exhibit "A".

[3] *See* Executive Order 50-20, attached as Exhibit "B".

6.      E.O. No. 50-20 provided that "[a]ll individuals age 9 and over within the State of

West Virginia shall wear an adequate face covering when in confined, indoor spaces, other than

when in one's residence or when actively engaged in the consumption of food and/or beverage,

and when not able to adequately social distance from other individuals who do not reside in the

same household. The Governor posted the following on his social media accounts:



7.      The "mask mandate" was represented by the Governor as a component of "West

Virginia Strong - The Comeback," and was publicized by the Governor on his website and his

social media as "taking effect" on July 7, 2020 at 12:00 a.m. The Governor published, as a

subpart of "The Comeback," the "Guide to Safely Opening Restaurants and Bars" which

provides for the following:

> **Face Coverings**: Per Executive Order 50-20, all individuals over the age of 9 are
> required to use face coverings (masks, bandannas, face shields, etc.) when in confined,
> indoor spaces, other than one's residence or while actively engaged in the consumption of
> food and/or beverage, and when not able to adequately social distance from other
> individuals who do not reside in the same household. Employees must wear cloth or
> disposable face coverings where applicable. Such coverings shall be cleaned or replaced
> daily. Employers should consider special accommodations for employees when working
> over high heat or with breathing problems.

*See* Guide to Safely Opening Restaurants and Bars, West Virginia Strong, The Comeback.[4] The
following was posted on the Governor's website:

---

[4] https://governor.wv.gov/Documents/Covid%20Week%205/2020.05.29%20Restaurants%20and
%20Bars%20Guidelines.pdf

8.     Plaintiffs own and operate the Bridge Cafe & Bistro restaurant in Hurricane, Putnam County, West Virginia, within the Southern District of West Virginia, as well as the Huntington Division of the said District. Following the Governor's "Stay at Home Order," they suffered closure as a "non-essential business," and only reopened once the Governor allowed limited opening of restaurants across the State. During the period of closure and limited re-opening with restrictions, the plaintiffs suffered substantial economic damage to their small business, as did almost all other restaurants in the State. The restrictions and closures were not limited to specific counties, or high-impact COVID-19 areas, but were applied to all restaurants, including the Bridge Cafe & Bistro.

9.     Following the ability to reopen with restrictions, the Governor issued the "mask mandate," which in turn created social media interest pertaining to its application to restaurants and the community at large. It quickly became an intense political discussion and political issue, much of it centered around what was going to be "mandatory," and what would be subject to personal choice and individual freedom.

10.     Seeking to address these concerns, discussions, and issues, on July 8, 2020, the plaintiffs published a post on their restaurant's Facebook page, expressing their beliefs, opinions, and ongoing policy regarding mandatory mask usage in their restaurant, in response to the Governor's mask mandate. The plaintiffs posted the following, which is hereby incorporated by reference as though fully restated herein:



11.     The post announced that they have chosen not to require staff to wear a face

covering, expressing that all individuals in their restaurant, including the staff members who

work within the business. This included themselves, given their beliefs that they also should be

free to make their own choices, and that they respected the liberties and choices of their

employees and customers, and that they weren't going to force anyone to wear a mask. Plaintiffs

listed the safe alternatives, including social distancing, online ordering, and orders for takeout. It was signed, "The Stewarts and Bridge Family."

12.     The post quickly went viral as mask proponents began to share the post, viciously attacking the plaintiffs for their beliefs expressed therein. The post generated thousands of comments, both in support and in derision of the post, and quickly made its way around the local sphere of social media. This in turn brought a substantial amount of coverage by local television news media.

13.     Upon information and belief, employees of the Putnam County Health Department, which are actually employees of the Putnam County Commission, became aware of the plaintiffs' social media post. Registered Sanitarian, a.k.a. Health Inspector, Rick Snaman, contacted the plaintiffs in regards to the social media post. Snaman contacted the restaurant within mere hours of the post, threatening an inspection of the restaurant to determine whether they were compliant with the Governor's mask mandate. Snaman informed them that as a result of the expressions and speech contained in their Facebook post, that they would be shut-down by the Putnam County Department of Health if they failed to comply with the Governor's mask mandate, pursuant to Executive Order No. 50-20. Snaman gave the plaintiffs until Friday of that week to comply, and make it mandatory for all staff, including themselves, to wear face coverings, irregardless of their personal choices. The plaintiffs requested written documentation of any law or regulation of which they were in violation, but were provided with none. Snaman would only refer them to the Governor's website.

14.     On Thursday July 9, Defendant PCC, through Defendant Snaman, provided a statement to WCHS Eyewitness News that the Putnam County Health Department would be

8

closing the plaintiffs' restaurant on Friday, July 10 if the plaintiffs continued to choose to be in non-compliance with the Governor's mask mandate. Upon information and belief, Snaman also contacted the West Virginia Alcohol Beverage Control Administration in regards to seeking revocation of the plaintiffs' ABC license. According to the news report:

> A restaurant in Putnam County is facing a possible closure after its social media post this week announcing some employees aren't wearing masks.
>
> The Putnam County Health Department said it has informed Bridge Café & Bistro in Hurricane that it could lose its food service permit if workers don't start wearing masks. The health department said the state has mandated that food service workers wear masks. Officials said the restaurant will be inspected Thursday and if it's not in compliance, its permits will be revoked on Friday.
>
> The state Alcohol Beverage Control Administration could also revoke any alcohol permits Bridge Café & Bistro has, according to the health department.
> The restaurant posted on Facebook that it was not requiring its employees or customers to wear masks.

Later that same day, WCHS updated their story to add the following:

> A sanitarian with the Putnam County Health Department said Bridge Café & Bistro was not compliant Thursday in having employees wear masks.
>
> The restaurant was issued a formal notice that it is expected to comply by tomorrow, the health department said. If employees are not wearing masks during the inspection Friday, the restaurant's permits will be suspended.
>
> The state has mandated that food service workers wear masks.[5]

15.     On the morning of Friday, July 10, 2020, Defendant Snaman arrived at the Bridge Cafe & Bistro and performed an on-site inspection of the plaintiffs' restaurant to enforce compliance with the "Mask Mandate." Snaman gave the plaintiffs an "ultimatum" to require all

---

[5] *See* Health department: Hurricane restaurant could be shut down if staff doesn't wear masks, WCHS, July 9, 2020. https://wchstv.com/news/local/hurricane-restaurant-could-be-shut-down-if-staff-doesnt-wear-masks

staff to wear a mask, or else face immediate closure. Plaintiffs were later charged $50.00 for the

"follow up inspection" by the Putnam County Health Department, a subdivision of the PCC.

16.     Having no choice, the plaintiffs relented and complied with the mask mandate,

requiring the use of masks.

17.     WCHS News published the following story and social media post, after

Defendant Snaman's inspection and ultimatum on compliance with the mask mandate:

> A Hurricane restaurant that was facing a possible shut down for not following Gov. Jim
> Justice's face mask mandate is now in compliance. Bridge Café & Bistro was issued a
> formal notice this week from the Putnam County Health Department, saying if employees
> were not wearing the required face masks during the inspection Friday, the restaurant's
> permits would be suspended.



Earlier this week, the restaurant posted on Facebook that it was not requiring its employees or customers to wear masks.

Owner Andrew Stewart said after the health department visited Friday morning, he decided to enforce workers to wear a face mask. Stewart said he will not enforce customers to wear masks.[6]

18.    On the same day, July 10, 2020, Governor Justice threatened another economic shutdown "if people don't comply" with his mask order. WBOY news reported that, "Justice says one possible way to enforce the mandate is allowing local health departments to suspend the license of any business found to be non-compliant with the order."[7]

19.    Plaintiffs have continued to comply with the mask mandate, against their strongly-felt beliefs and views, as were expressed in their July 6, 2020 Facebook post. However, they only did so, and only continue to do so, under continued threat of closure by the PCC. According to the Centers for Disease Control and Prevention ("CDC"), there is no evidence to suggest that handling food or consuming food is associated with contracting COVID-19, which provided the following guidance to restaurants on the CDC website:

Currently, there is no evidence to suggest that handling food or consuming food is associated with COVID-19.

Coronaviruses, like the one that causes COVID-19, are thought to spread mostly person-to-person through respiratory droplets when someone coughs, sneezes, or talks. It is possible that a person can get COVID-19 by touching a surface or object, including food

---

[6] *See* Hurricane restaurant now in compliance; employees wearing face masks after notice, WCHS, July 10, 2020, https://wchstv.com/news/local/hurricane-restaurant-now-in-compliance-employees-wearing-face-masks-after-notice?fbclid=IwAR1gN0EP7Y0P_qw6WyPKlil-euO07FM9aiWmAyzRpYmZKKStfbAJ2yxoXVM

[7]*See* Gov. Justice threatens to shutdown reopening if people don't comply with mask order, by Joey Stipek, July 10, 2020. https://www.wboy.com/news/health/coronavirus/gov-justice-threatens-to-shutdown-reopening-if-people-dont-comply-with-mask-order/?fbclid=IwAR3tQqHY8l_6VuxDLamS0byDzKSNH1ZxXa5cNpOHb91wuAfkqZr6OXqZdtQ

or food packaging, that has the virus on it and then touching their own mouth, nose, or possibly their eyes. However, this is not thought to be the main way the virus spreads.[8]

20.    Defendant Snaman returned to the restaurant a few days later, on July 14, 2020 to conduct yet another inspection pertaining to compliance with the "mask mandate." Defendant Snaman was continuing his retaliation against the plaintiffs for the stance and comments they had made on Facebook. Plaintiff were later charged yet another $50.00 for the "follow up inspection" by the Putnam County Health Department.

### COUNT ONE - CIVIL RIGHTS VIOLATION UNDER 42 U.S.C. 1983 FIRST AMENDMENT RETALIATION

21.    Plaintiffs incorporate by reference all of the prior paragraphs as though fully restated herein.

22.    The plaintiffs engaged in protected First Amendment speech when they published the July 8, 2020 Facebook post about their decision regarding whether they would require their employees to wear a face mask in response to the Governor's July 6, 2020 "mask mandate" which had been scheduled to become effective on July 7, 2020.

23.    The debate over the use of face masks, and especially policies of compulsory use of face masks, has been the subject of highly-charged political debates:

**The debate about masks could intensify in coming weeks as U.S. cases surge amid economic reopening.** Some state governments are newly moving to mandate the wearing of masks in public, but plenty of people, including the president and some of his supporters, still rarely wear one.

How the split over masks sums up America's chaotic coronavirus response, by Adam Taylor,

_____

[8] https://www.cdc.gov/foodsafety/newsletter/food-safety-and-Coronavirus.html

The Washington Post, June 25, 2020 (emphasis original); *see also* <u>Face mask political debate becomes public flashpoint propelled by social media</u>, Fox News, by Caitlin McFall, August 8, 2020.[9]

24.     As the Supreme Court has recently noted, social media – and Facebook in particular – has become a vital platform for speech of all kinds. *See* <u>Packingham</u>, 137 S. Ct. at 1735-36.[10] Indeed, social media may now be "the most important" modern forum "for the exchange of views." <u>Id</u>. at 1735. The First Amendment applies to speech on social media with no less force than in other types of forums. *See, e.g.*, <u>Bland v. Roberts</u>, 730 F.3d 368, 386 n.14 (4th Cir. 2013), as amended (Sept. 23, 2013) (*quoted by* <u>Davison</u> at 30-31).[11]

25.     The circulation of political ideas "typically receives 'the broadest protection' afforded by the First Amendment." <u>Fusaro v. Cogan</u>, 930 F.3d 241, 251 (4th Cir. 2019) (*citing* <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U.S. 334, 346, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). The plaintiffs intended to, and did in fact express, their political ideas when they announced on social media - the day after the "mask mandate" became effective in West Virginia - that they would continue to allow their staff, including themselves, to have the freedom to choose whether they wanted to wear a mask, rather than to require them to wear a mask.

26.     The reaction of the PCC, by and through the Putnam County Health Department and Defendant Snaman, to threaten adverse regulatory action against their restaurant, by

---

[9] https://www.foxnews.com/us/face-masks-a-political-debate-and-public-flash-point-propelled-by-social-media

[10] <u>Packingham v. North Carolina</u>, 137 S. Ct. 1730 (U.S. 2017)

[11] *Quoting* the Complaint at 53. *Citing* <u>Davison v. Loudoun County Board of Supervisors</u>, Memorandum of Decision, 1:16-cv-932 (July 25, 2017 E.D. Va.) (finding legislator's Facebook page censorship was First Amendment retaliation under color of law).

revoking their operation permits and/or closing them down, as well as subjecting them to immediate inspection and adverse comments in the media, are actions which would "chill a person of ordinary firmness" from continuing to engage in the protected activity of sharing their political ideas, opinions and views, regarding compulsory mask mandates, on social media.

27.     Upon information and belief, the plaintiffs' protected free speech was the substantial, if not sole, motivating factor in Defendant Snaman's conduct in engaging in adverse regulatory conduct against the plaintiffs' restaurant, including inspection, threatening shutdown, and making adverse statements to the news media.

28.     Upon information and belief, Defendant Snaman's and Defendant PCC's actions in taking retaliatory punitive actions against the plaintiffs, were at the tacit direction of, or performed to further the political support of, Governor James C. Justice, II, who made the public statement threatening the use of punitive actions by local health boards in order to enforce his executive orders. *See* Gov. Justice threatens to shutdown reopening if people don't comply with mask order, by Joey Stipek, July 10, 2020.[12]

29.     Defendant Snaman, acting under color of law as an employee and agent of the PCC, intended to interfere with the plaintiffs' First Amendment rights, as described herein.

30.     The plaintiffs suffered substantial injury as a result, including both constitutional injury, as well as economic injury. Defendant Snaman is liable for the same.

---

[12] https://www.wboy.com/news/health/coronavirus/gov-justice-threatens-to-shutdown-reopening-if-people-dont-comply-with-mask-order/?fbclid=IwAR3tQqHY8l_6VuxDLamS0byDzKSNH1ZxXa5cNpOHb91wuAfkqZr6OXqZdtQ

## COUNT TWO - MONELL CLAIM UNDER 42 U.S.C. 1983
## AGAINST THE PUTNAM COUNTY COMMISSION

31.     Plaintiffs incorporate by reference all of the prior paragraphs as though fully restated herein.

32.     The PCC, by and through the Putnam County Health Department, instituted an official policy, custom, and practice of retaliation against protected First Amendment speech, as well as the enforcement of a so-called "mask mandate" under the threat of regulatory action and closure, in violation of the plaintiffs' Fourteenth Amendment rights to Due Process of law, as well as their First Amendment right to freedom of speech.

33.     The actions of Defendant Snaman on behalf of the PCC as described herein were taken in furtherance of the said official policy, custom, and practice of First Amendment retaliation and regulatory enforcement of the Governor's "mask mandate" in violation of the plaintiffs' Fourteenth Amendment Due Process rights, Equal Protection rights, and First Amendment rights.

34.     In furtherance of the said policy, the Putnam County Health Department has continued to require the plaintiffs, as well as other restaurants and businesses to refrain from expressing political ideas or views regarding the mask debate, or from choosing whether to require staff members to wear a mask, lest they suffer regulatory closure and punitive actions.

35.     Upon information and belief, the PCC, by and through the Defendant Snaman and the Putnam County Health Department, instituted a policy, custom and practice of subjecting restaurants within their jurisdiction, including the plaintiffs' restaurant, to punitive regulatory action in response to the Governor's "mask mandate" and/or other COVID-19 related executive

15

orders issued by the Governor, which are not a enforceable laws enacted by the legislature. Defendant PCC has demonstrated their intention to continue with their policy of enforcing non-existent laws and the mask mandate through their punitive regulatory actions taken against the plaintiffs as described herein.

36.     As a direct and proximate result of the said policy, custom and practice, the plaintiffs were severely damaged as described herein, for which they are entitled to recover.

## COUNT THREE - DECLARATORY AND INJUNCTIVE RELIEF

37.     Plaintiffs incorporate by reference all of the prior paragraphs as though fully restated herein.

38.     Plaintiffs have, and continue to have, their fundamental constitutional rights violated by these official capacity Defendants, each of whom is personally involved with the enforcement and/or threatened enforcement of the challenged orders.  Plaintiffs will be irreparably harmed if injunctive relief is not issued.  Further, the public interest is served by the vindication of constitutional rights, and the weighing of harms warrants issuing injunctive relief.

39.     As recently as September 10, 2020, Governor Justice posted on twitter, using his official twitter account, warning people that "the mandatory face covering requirement" was still in place. He continues to post similar messages on an almost daily basis, such as the following:



40.     Defendants utilized the authority of their respective offices and, while acting under color of law and with knowledge of Plaintiffs' established rights, used their offices to violate plaintiffs' Constitutional rights, privileges, or immunities secured by the Constitution and other federal laws, as described herein, below.

41.     Thus, under 42 U.S.C 1983, Plaintiffs seek declaratory relief and injunctive relief. Pursuant to 42 U.S.C. 1988, Plaintiffs further seek their reasonable attorney fees and costs.

## THE CONSTITUTIONAL RIGHTS VIOLATED BY THE DEFENDANTS

### First Amendment

42.     Viewpoint discrimination is itself a violation of the First Amendment. The

Supreme Court articulated this principle in Rosenberger v. Rector & Visitors of the Univ. of Va.,

515 U.S. 819, 828-829 (1995), observing that while "[i]t is axiomatic that the government may

not regulate speech based on its substantive content or the message it conveys," and while

"government regulation may not favor one speaker over another," that "[w]hen the government

targets not subject matter, but particular views taken by speakers on a subject, the violation of the

First Amendment is all the more blatant." Id.  Thus, "[v]iewpoint discrimination is thus an

egregious form of content discrimination." Id. at 829.  "The government must abstain from

regulating speech when the specific motivating ideology or the opinion or perspective of the

speaker is the rationale for the restriction." Id.  *See, also,* McCullen v. Coakley, 573 U.S. 464,

484-485 (2014) (noting that permitting one class of speakers to speak and not another raises

questions of viewpoint discrimination).

43.     Both content- and viewpoint-based discrimination are subject to strict scrutiny.

McCullen, 134 S. Ct. 2518, 2530, 2534 (2014). No state action that limits protected speech will

survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means

available to serve a compelling government interest. United States v. Playboy Entm't Grp., 529

U.S. 803, 813 (2000).  *See, also,* Bible Believers v. Wayne County, 805 F.3d 228, 248 (6th Cir.

2015).

44.     Supreme Court cases make clear that in public forums, government may impose

reasonable restrictions on the time, place, or manner of protected speech, provided the

restrictions are (i) not based on content (content-neutral); (ii) narrowly tailored to serve a significant governmental interest; and (iii) leave open ample alternative channels for communication of the information. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984); Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

45. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Reed v. Town of Gilbert, 135 S. Ct. 2218, 2227 (2015). "This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys." Id. "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." Id. "Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." Id. "Because strict scrutiny applies either when a law is content based on its face, or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." Id. at 2228. "Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. Ibid. For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." Id. at 2229.

46. The act and the choice of wearing a mask over one's face versus not wearing a mask, like it or not, has become political speech. Those who choose to express their beliefs

against the wearing of a face mask, including political and public expressions supporting

nonconformity with unconstitutional and un-American laws, which have not undergone the

legislative process, are not free to engage in such speech. The so-called "mask mandate," by the

Governor, and the enforcement of the mandate by Defendant Snaman, and the PCC, establishes a

content restriction and takes a policy position. Such actions establishe a content preference,

under color of law.

47.     Nor is the mask mandate and its enforcement by Defendants Snaman and the PCC

"narrowly tailored to serve a significant governmental interest." There has been no legislation

enacted by the West Virginia legislature, enabling an analysis of the government activity as to

whether it is narrowly tailored. Nor can there yet be a proper analysis as to what the specific

governmental interest is pertaining to the mask mandate and its enforcement, given its issuance

via executive order. Rather, the actions thus far have consisted solely of the issuance of an

unenforceable executive order which has been, and which continues to be, enforced by

Defendants Snaman and the PCC. Such actions cannot as of yet be subjected to appropriate

scrutiny because they have taken place outside the legislative process and the constitutional

bounds of the enactment of legislation.

48.     Moreover, the defendants have violated the First Amendment because the "Mask

Mandate" is unconstitutionally vague. A law is vague if it "fails to provide fair notice to those to

whom it is directed." Gentile v. State Bar of Nev., 501 U.S. 1030, 1048 (1991) (internal quotation

marks omitted). To determine whether a law provides such notice, the test in most contexts is

whether a law "give[s] the person of ordinary intelligence a reasonable opportunity to know what

is prohibited." <u>Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc</u>., 455 U.S. 489, 498 (1982).

49.    In the free-speech context, however, the "standards of permissible statutory vagueness" are even stricter. <u>NAACP v. Button</u>, 371 U.S. 415, 433 (1963). The freedom of speech is "delicate and vulnerable, as well as supremely precious in our society . . . [and] the threat of sanctions may deter [speech] almost as potently as the actual application of sanctions." <u>Id</u>.

50.    A content-based regulation is therefore not narrowly tailored—i.e., it is unconstitutional—if it is too vague. *See* <u>Hill</u>, 482 U.S. 451.  "The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." <u>Reno v. Am. Civil Liberties Union</u>, 521 U.S. 844, 871-872 (1997).

51.    Moreover, vague laws give authorities discretion to enforce the law against one speaker but not others, thus creating the "risk of discriminatory enforcement." <u>Id</u>. at 872.  "Such discretion is particularly repugnant given the eternal temptation … to arrest the speaker rather than to correct the conditions about which he complains." <u>Hill</u>, 482 U.S. at 465 n.15.  In short, "First Amendment freedoms need breathing space to survive," and thus the "government may regulate in the [free-speech] area only with narrow specificity." <u>Id</u> at 433.

52.    The so-called "mask mandate" purports to require the mandatory use of face coverings while indoors where "social distancing cannot be maintained." The exception of social distancing is in and of itself vague. The "Comeback Plan" as it pertains to restaurants does not allow a social distancing exception, requiring compliance even where social distancing is maintained. Moreover, social distancing is a vague concept in general, incapable of any bright-

line determination or definition, in the absence of lawful legislative activity. This allows selective

enforcement and sanctions, such as occurred to the plaintiffs herein.

### 14th Amendment Due Process Clause - Procedural Due Process

53.     The U.S. Constitution, the Supreme Law of the Land, prohibits government from

depriving the plaintiffs of their life, liberty and property interests, without due process of law.

The plaintiffs and their constituents owned protected liberty interests in the right to live without

arbitrary governmental interference with his liberty and property interests. County of Sacramento

v. Lewis, 523 U.S. 833, 845 (1988). Liberty "denotes not merely freedom from bodily restraint

but also the right of the individual to contract, to engage in any of the common occupations of

life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship

God according to the dictates of his own conscience, and generally to enjoy those privileges long

recognized ... as essential to the orderly pursuit of happiness by free men." Board of Regents of

State Colleges v. Roth, 408 U.S. 564, 572 (1972).

54.     "It requires no argument to show that the right to work for a living in the common

occupations of the community is of the very essence of the personal freedom and opportunity

that it was the purpose of the [fourteenth] Amendment to secure." Truax v. Raich, 239 U.S. 33,

41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915). *See also* Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct.

625, 626, 67 L.Ed. 1042 (1923) ("Without doubt, ['liberty' in the fourteenth amendment] denotes

not merely freedom from bodily restraint but also the right of the individual to contract, to

engage in any of the common occupations of life ...."); Schware v. Board of Bar Examiners, 353

U.S. 232, 238-39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957) ("A state cannot exclude a person

from the practice of law or from any other occupation in a manner or for reasons that contravene

the Due Process or Equal Protection Clause of the Fourteenth Amendment.") (footnote omitted);

Greene v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400 1411, 3 L.Ed.2d 1377 (1959) ("[T]he right

to hold specific private employment and to follow a chosen profession free from unreasonable

governmental interference comes within the 'liberty' and 'property' concepts of the Fifth

Amendment ...."); Board of Regents v. Roth, 408 U.S. 564, 573-74, 92 S.Ct. 2701 2707, 33 L.Ed.

2d 548 (1972) (respondent denied relief because "[t]he State, for example, did not invoke any

regulations to bar the respondent from all other public employment in state universities. Had it

done so, this, again, would be a different case.") (quoting Phillips v. Vandygriff, 711 F.2d 1217

(5th Cir. 1983)).

55.     A business itself, constitutes a protected property right under the Fourteenth

Amendment:

> Clearly, a business is an established property right entitled to protection under the
> Fourteenth Amendment. *See, e.g.*, Duplex Printing Press Co. v. Deering, 254 U.S. 443,
> 465, 41 S.Ct. 172, 176, 65 L.Ed. 349 (1921) (finding that a "business ... is a property
> right, entitled to protection against unlawful injury of interference ...."); United States v.
> Tropiano, 418 F.2d 1069, 1076 (2d Cir.1969) ("The right to pursue a lawful business
> including the solicitation of customers necessary to the conduct of such business has long
> been recognized as a property right within the protection of the Fifth and Fourteenth
> Amendments to the Constitution.") (citations omitted); Small v. United States, 333 F.2d
> 702, 704 (3d Cir.1964) ("The right to pursue a lawful business or occupation is a right of
> property which the law protects against intentional and unjustifiable interference. A cause
> of action based upon such an interference is analogous to one based upon unlawful
> interference with existing contracts, and is governed by the same principles."), 131 F.3d
> 353, 361 (3d Cir.1997) (citations omitted).

Mfs Inc. v. Dilazaro, 771 F.Supp.2d 382, 434-35 (E.D. Pa. 2011); *see also* Bannum, Inc. v. Town

of Ashland, 922 F.2d 197 (4th Cir. 1990) (the mere denial of a business opportunity, without

more, such as deprivation of an existing business benefit or entitlement, does not deprive a

person of a property or liberty interest).

56.     "[T]here can be no doubt that at a minimum [procedural due process] require[s]

that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity

for hearing appropriate to the nature of the case." Mullane v. Cent. Hanover Bank & Trust Co.,

339 U.S. 306, 313 (1950).  "A fair trial in a fair tribunal is a basic requirement of due process."

In re Murchison, 349 U.S. 133, 136 (1955).

57.     "Procedural due process rules are meant to protect persons not from the

deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in

deciding what process constitutionally is due in various contexts, the Court repeatedly has

emphasized that "procedural due process rules are shaped by the risk of error inherent in the

truth-finding process...." Carey v. Piphus, 435 U.S. 247, 259 (1978) (citing Mathews v. Eldridge,

424 U.S. 319, 344 (1976)).

58.     At its core, procedural due process requires "notice and an opportunity to be heard

at a meaningful time and in a meaningful manner." Garcia v. Fed. Nat'l Mortg. Ass'n, 782 F.3d

736, 741 (6th Cir. 2015).

59.     Plaintiffs have a property interest in the right to pursue their lawful business, the

Bridge Cafe & Bistro, including the right to solicit and pursue customers and operate their

business without intentional and unjustifiable interference by the Governor, and/or by local

health officials who are creating new laws without any representation or involvement of the

plaintiffs' elected representatives. Plaintiffs were deprived of this property interest by the

Governor's issuance of his "Stay at Home Order," as well as the ensuing "mask mandate," and of

course the punitive regulatory actions and public statements of Defendants PCC and Snaman specifically directed at their business, to their detriment.

60.     Defendants' actions, taken without notice, and without the opportunity for a hearing or other legal process, foreclosed the plaintiffs from exercising their First Amendment rights and also dispossessed, and threatened to dispossess, their property interests under the 14th Amendment, without due process of law.


**14th Amendment Due Process Clause - Substantive Due Process**

61.     Substantive due process is not an independent right, but rather, a recognition that the government may not infringe upon certain freedoms enjoyed by the people as a component of a system of ordered liberty.

62.     Even assuming the West Virginia Governor possessed the constitutional ability to enact a "Stay at Home Order," closure of the plaintiffs' restaurant as a "non-essential" business under the "Stay at Home Order" by Governor Justice, violates the plaintiffs' substantive due process rights.

63.     The "Stay at Home Order" and the ensuing "Mask Mandate" by Governor Justice violate the plaintiffs substantive due process rights because they do not impose traditional disease control measures, such as quarantine or isolation, but rather involuntarily, and without due process, instead confining the entire population of the state to their homes absent a specifically approved purpose, or specifically approved "essential" business to operate.

64.     Moreover, the said orders violate the fundamental right to intrastate travel and their freedom of movement.

65.     Lastly, the said orders are overbroad, and far exceeded any legitimate government need, and far exceeded any legitimate authority. As the Western District of Pennsylvania recently noted in its opinion striking down the lockdown order and crowd gathering limitation issued by the Pennsylvania Governor, "broad population lockdowns are unprecedented in American law:"

> Defendants attempt to justify their extraordinary "mitigation" efforts by pointing to actions taken to combat the Spanish Flu pandemic a century ago. Ms. Boateng testified that, in response to the Spanish Flu, "much of the same mitigation steps were taken then, the closing of bars, saloons, cancellation of vaudeville shows, as they called them, and cabarets, the prohibition of large events. So some of these same actions that we're taking now had been taken in the past." But an examination of the history of mitigation efforts in response to the Spanish Flu—by far the deadliest pandemic in American history— reveals that nothing remotely approximating lockdowns were imposed.

County of Butler, et al. v. Thomas W. Wolf, et al., Civil Action No. 2:20-cv-677 (Sept. 14, 2020).

66.     The Supreme Court has recognized that the "core of the concept" of substantive due process is the protection against arbitrary government action. Lewis, 523 U.S. at 845 (*citing* Hurtado v. California, 110 U.S. 516, 527 (1884)). Indeed, "the touchstone of due process is protection of the individual against arbitrary actions of government . . . ." Id. Rational basis review is a forgiving standard for government acts, but it "is not a toothless one . . . ." Mathews v. Lucas, 427 U.S. 495, 510 (1976). As a general matter, the rational basis test requires only that the governmental action "bear a rational relationship to some legitimate end." Romer v. Evans, 517 U.S. 620, 631 (1996). Conversely, actions which are irrational, arbitrary or capricious do not bear a rational relationship to any end. Cty. Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 169 (3d. Cir. 2006).

67.     Given that the West Virginia Governor has been acting outside the State Constitution, which requires legislation to be enacted by the legislature, it is unknown who is

actually making the policy decisions which resulted in the plaintiffs' restaurant being subjected

to closure as a "non-essential" business, as well as the ensuing "mask mandate." Upon

information and belief, there was no concrete and rational definition or process behind which

businesses were subjected to closure as "non-essential" and which business were allowed to be

operational as "essential." It would be unconstitutionally arbitrary, for instance, for a business to

be deemed "essential" just because a business was deemed "essential." The Governor has not

utilized a process to define the classification and which would allow recourse for mistaken

classification. As the District Court in Pennsylvania noted on September 14, addressing the

challenge against the Pennsylvania Governor's mandates:

> The Court recognizes that Defendants were acting in haste to address a public health
> situation. But to the extent that Defendants were exercising raw governmental authority
> in a way that could (and did) critically wound or destroy the livelihoods of so many, the
> people of the Commonwealth at least deserved an objective plan, the ability to determine
> with certainty how the critical classifications were to be made, and a mechanism to
> challenge an alleged misclassification. The arbitrary design, implementation, and
> administration of the business shutdowns deprived the Business Plaintiffs and their
> fellow citizens of all three.

County of Butler, et al. v. Thomas W. Wolf, et al., Civil Action No. 2:20-cv-677 (Sept. 14, 2020).

68.     The Governor's delineation of which business is "essential" or "non-essential" is

wholly arbitrary. As in Pennsylvania, an "essential" business - usually a large corporation - may

lawfully be allowed to sell the same item that a "non-essential" business - usually a small

business owner, such as the plaintiffs - was not allowed to sell under the arbitrary order. As the

Pennsylvania Court elaborated:

> Another layer of arbitrariness inherent in the business shutdown components of
> Defendants' orders are that many "non-life-sustaining" businesses sell the same products
> or perform the same services that were available in stores that were deemed "life-
> sustaining." For example, Plaintiff R.W. McDonald & Sons is a small appliance and

furniture store that was deemed a "non-life-sustaining" business and required to close. But larger retailers selling the same products, such as Lowes, The Home Depot, Walmart and others remained opened.

County of Butler, et al. v. Thomas W. Wolf, et al., Civil Action No. 2:20-cv-677 (Sept. 14, 2020).

69.     To the extent that Governor Justice has relaxed or modified, or amended, the "Stay at Home Order," or the "Mask Mandate," the issues are not moot under the voluntary cessation doctrine. *See* Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC) Inc., 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.") (citation omitted); *see also* County of Butler, et al. v. Thomas W. Wolf, et al., Civil Action No. 2:20-cv-677 (Sept. 14, 2020).

**Equal Protection Clause of the 14th Amendment**

70.     The Equal Protection Clause of the Fourteenth Amendment forbids the states to "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. 14th Amend. Where a plaintiff in an equal protection claim does not allege that distinctions were made on the basis of a suspect classification such as race, nationality, gender or religion, the claim arises under the "class of one" theory. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). To prevail on such a claim, the plaintiff must demonstrate: 1) the defendant treated him differently than others similarly situated, 2) the defendant did so intentionally, and 3) there was no rational basis for the difference in treatment. Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d. Cir. 2006). As explained above, the rational basis test is forgiving, but not without limits in its deference. Distinctions cannot be arbitrary or irrational and pass scrutiny. "The State may not

rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 446(1985).

71.    The "Stay at Home Order" and the "mask mandate" failed to make distinctions between regions or counties within the State of West Virginia. While the Governor did at times issue more harsh restrictions to some "hot spots," the said orders were applied across the board to all counties, even where there had been no COVID-19 diagnoses or deaths. The Governor issued the orders with no recognition for differences in population density, infrastructure and other factors relevant to the effort to address the virus. According to the West Virginia Department of Health and Human Resources COVID-19 Dashboard,[13] after over 6 months of being under a "State of Emergency" Putnam County, West Virginia has suffered only 2 deaths. These deaths occurred in a county population of 56,450 (as of 2019).[14] This yields a fatality rate in Putnam County of approximately 4 deaths per 100,000 residents. Contrast the COVID death data with Putnam County's historic death data for ischemic heart disease in male residents, which is almost 200 deaths per 100,000 residents per year; or stroke deaths in males at almost 52 deaths per 100,000 residents per year; or lung cancer deaths in males, at 83 deaths per 100,000 residents per year. Even suicide deaths among males in Putnam County, West Virginia was found to be around 25 deaths per 100,000 residents per year.[15] Thus, COVID-19 has caused statistically-nominal deaths in Putnam County. To subject Putnam County to a "State of

_____

[13] https://dhhr.wv.gov/COVID-19/Pages/default.aspx, accessed September 15, 2020.

[14] https://en.wikipedia.org/wiki/Putnam_County,_West_Virginia

[15] The Institute for Health Metrics and Evaluation (IHME) at the University of Washington Statistics for Putnam County, West Virginia, for 2014, http://www.healthdata.org/sites/default/files/files/county_profiles/US/2015/County_Report_Putnam_County_West_Virginia.pdf

Emergency" form of government, for a period of over 6 months, during which only 2 people have died from the virus, has been completely irrational.

72.     Moreover, there has been no rational basis in treating the plaintiffs' restaurant, and other restaurants in Putnam County, as designated "non-essential" businesses subject to closure. In addition to the fact that they are located in an area which has only nominally been affected by the virus, the Governor had no rational basis for the disparate treatment of other similarly situated businesses which were deemed "essential" and thus allowed to open and continue operations. For instance, upon information and belief, the Governor's personally-owned resort, The Greenbrier, was never similarly closed. It has multiple restaurants inside the resort which have been in continuous operation as "essential" businesses. As the Pennsylvania Court pointed out, there is no legal precedent for such government tyranny, much less by executive fiat alone:

> As with the lockdown, Defendants' shutdown of all "non-life-sustaining" businesses is unprecedented in the history of the Commonwealth and, indeed, the nation. While historical records show that certain economic activities were curtailed in response to the Spanish Flu pandemic, there has never been an instance where a government or agent thereof has sua sponte divided every business in the Commonwealth into two camps —"life-sustaining" and "non-life- sustaining"—and closed all of the businesses deemed "non-life-sustaining" (unless that business obtained a discretionary waiver). The unprecedented nature of the business closure—even in light of historic emergency situations—makes its examination difficult from a constitutional perspective.
>
> It simply does not neatly fit with any precedent ever addressed by our courts. Never before has the government exercised such vast and immediate power over every business, business owner, and employee in the Commonwealth. Never before has the government taken a direct action which shuttered so many businesses and sidelined so many employees and rendered their ability to operate, and to work, solely dependent on government discretion. As with the analysis of lockdowns, the unprecedented nature of the business shutdowns poses a challenge to its review. Nevertheless, having reviewed this novel issue in light of established Due Process principles, the Court holds that the business closure orders violated the Fourteenth Amendment….[16]

---

[16] County of Butler, et al. v. Thomas W. Wolf, et al., Civil Action No. 2:20-cv-677 (Sept. 14, 2020).

73.     The CDC has found no scientific link between food preparation/handling and

transmission of COVID-19. According to the Centers for Disease Control and Prevention

("CDC"), there is no evidence to suggest that handling food or consuming food is associated

with contracting COVID-19, which provided the following guidance to restaurants on the CDC

website:

> Currently, there is no evidence to suggest that handling food or consuming food is
> associated with COVID-19. Coronaviruses, like the one that causes COVID-19, are
> thought to spread mostly person-to-person through respiratory droplets when someone
> coughs, sneezes, or talks. It is possible that a person can get COVID-19 by touching a
> surface or object, including food or food packaging, that has the virus on it and then
> touching their own mouth, nose, or possibly their eyes. However, this is not thought to be
> the main way the virus spreads.[17]

74.     Large corporate businesses such as Walmart, Lowe's and Home Depot were

allowed to remain open in West Virginia, and elsewhere, including Pennsylvania, despite face-to-

face interactions inevitably occurring at those businesses. As the Pennsylvania Court noted:

> Finally, the record shows that Defendants' shutdown of "non-life-sustaining" businesses
> did not rationally relate to Defendants' stated purpose. The purpose of closing the "non-
> life- sustaining" businesses was to limit personal interactions. Ms. Boateng averred: "[i]n
> an effort to minimize the spread of COVID-19 throughout Pennsylvania, the Department
> [of Health] sought to limit the scale and scope of personal interaction as much as possible
> in order to reduce the number of new infections." "Accordingly, it was determined that
> the most effective way to limit personal interactions was to allow only businesses that
> provide life sustaining services or products to remain open and to issue stay-at-home
> orders directing that people leave their homes only when necessary."
>
> But Defendants' actions did not rationally relate to this end. Closing R.W. McDonald &
> Sons did not keep at home a consumer looking to buy a new chair or lamp, it just sent
> him to Walmart. Refusing to allow the Salon Plaintiffs to sell shampoo or hairbrushes did
> not eliminate the demand for those products, it just sent the consumer to Walgreens or
> Target. In fact, while attempting to limit interactions, the arbitrary method of distinction
> used by Defendants almost universally favored businesses which offered more, rather

---

[17] https://www.cdc.gov/foodsafety/newsletter/food-safety-and-Coronavirus.html

than fewer products. As such, the largest retailers remained open to attract large crowds, while smaller specialty retailers—like some of the Business Plaintiffs here—were required to close. The distinctions were arbitrary in origin and application. They do not rationally relate to Defendants' own stated goal. They violate the Equal Protection Clause of the Fourteenth Amendment.

County of Butler, et al. v. Thomas W. Wolf, et al., Civil Action No. 2:20-cv-677 (Sept. 14, 2020).

75.     Moreover, the "mask mandate" likewise has been employed statewide in all counties, including Putnam County, where COVID-19 has caused only 2 deaths in over 6 months, in a county with over fifty thousand residents. It remains in effect. The Governor could have had no rational basis for such an order. Therefore, the order was arbitrary in origin and application. It does not rationally relate to any legitimate effort at the government addressing the COVID-19 virus. It therefore violates the Equal Protection Clause of the 14th Amendment.

**Executive Orders in West Virginia are Not Enforceable State Laws**

76.     A governor of West Virginia may not "engraft future declarations" of unlawful conduct onto existing state statutes by executive order. The West Virginia Supreme Court of Appeals held that, "[t]he authority to enact laws, being exclusively a legislative function, cannot be transferred or abdicated to others." State ex rel. State Line Sparkler of WV, Ltd. v. Teach, 418 S.E.2d 585, 187 W.Va. 271 (W. Va. 1992) (holding that the legislature cannot empower the Board of Pharmacy with the ability to declare future criminal violations of the present statutes without violating the separation of powers).

77.     Therefore, even if the emergency powers statute, W. Va. Code 15-5-6, expressly authorized the Governor to unilaterally graft new declarations of law onto existing enforceable

state law, which it doesn't, such an attempted delegation would be unlawful under the West

Virginia Constitution.

78.     Gov. Justice relies primarily on subsection (6) of the express emergency powers

as his primary support, which has been recited as the legal foundation of the COVID-19

executive orders. The subsection provides that during a declared "State of Emergency," the

Governor has the power:

> To control ingress and egress to and from a disaster area or an area where large-scale
> threat exists, the movement of persons within the area and the occupancy of premises
> therein.

W. Va. Code 15-5-6(c)(6).

79.     The emergency powers of 15-5-6, despite the broad language included in

subsection (6) cannot suspend the rights and obligations contained in the West Virginia

Constitution. Gov. Justice exceeded his statutory powers and violated the Constitution, by

admittedly "closing" or "shutting down" the State, as well as requiring a face covering under

threat of business closure, thus depriving the people of their liberty, property, and their pursuit of

happiness. In direct opposition to the Governor's actions, the West Virginia Constitution instead

provides that it's the inherent and solemn duty of State government to guard and protect its

citizens from such intrusions. As the Pennsylvania Court pointed out, there is no legal precedent

for such tyrannical assumption of power:

> The fact is that the lockdowns imposed across the United States in early 2020 in
> response to the COVID-19 pandemic are unprecedented in the history of our
> Commonwealth and our Country. They have never been used in response to any other
> disease in our history. They were not recommendations made by the CDC. They were
> unheard of by the people this nation until just this year. It appears as though the
> imposition of lockdowns in Wuhan and other areas of China—a nation unconstrained by
> concern for civil liberties and constitutional norms—started a domino effect where one

country, and state, after another imposed draconian and hitherto untried measures on their citizens. The lockdowns are, therefore, truly unprecedented from a legal perspective . . . .[18]

80.    The West Virginia Constitution establishes that the U.S. Constitution is the

supreme law of the land, and that the very purpose of West Virginia's state government is to

guard and protect the people of West Virginia from any and all encroachments on their liberty:

> The state of West Virginia is, and shall remain, one of the United States of America.  The constitution of the United States of America, and the laws and treaties made in pursuance thereof, shall be the supreme law of the land . . . .

> The government of the United States is a government of enumerated powers, and all powers not delegated to it, nor inhibited to the states, are reserved to the states or to the people thereof.  Among the powers so reserved to the states is the exclusive regulation of their own internal government and police; and it is the high and solemn duty of the several departments of government, created by this constitution, to guard and protect the people of this state from all encroachments upon the rights so reserved.

W. Va. Const. Art. 1, Sec. 1-2, 1-3.

81.    Additionally, the West Virginia Constitution solidifies the underlying principle

which was first asserted in the Declaration of Independence, that all rights secured by the two

respective constitutions, *natural rights endowed by our Creator*, will never be suspended under

any circumstances:

> The provisions of the constitution of the United States, and of this state, are operative alike in a period of war as in time of peace, and any departure therefrom, or violation thereof, under the plea of necessity, or any other plea, is subversive of good government, and tends to anarchy and despotism.

W. Va. Const. Art. 1, Sec. 1-3.

---

[18] <u>County of Butler, et al. v. Thomas W. Wolf, et al</u>., Civil Action No. 2:20-cv-677 (Sept. 14, 2020).

82.     Federal 14th Amendment deprivations have occurred, as discussed in detail above in paragraphs 53-75, which are hereby incorporated by reference, as though fully restated herein.

83.     The West Virginia Constitution vested the people's legislative authority in the Senate and the House of Delegates, and established an express separation of powers doctrine:

> The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the Legislature.

W. Va. Const. Art. 5, Sec. 5-1; *see also* W. Va. Const. Art. 6, Sec. 6-1 (vesting legislative power in the Senate and House of Delegates). Inherent in this doctrine, is the restriction on any one branch from controlling both its own powers, and the powers of any other branch, as the Governor is now doing at a furious pace, and without restriction.

84.     Gov. Justice's "Stay at Home" Order directed that it would be "enforced by State and local law enforcement, and by state and location regulatory and/or licensing bodies to the extent possible under West Virginia law." It further directed that it, along with all prior executive orders related to COVID-19, it would be effective "until terminated by subsequent executive order." *See* Executive Order 9-20.[19] The Governor's so-called "mask mandate" expressly incorporates Executive Order 9-20, i.e., the "Stay at Home Order," thus incorporating the enforcement provision. *See* E.O. 50-20.

85.     Executive Order 14-20[20] pertaining to 14 day quarantine for certain travelers, and law enforcement monitoring of interstate travel and COVID-19 monitoring provides that:

---

[19] App. at 42.

[20] App. at 53.

> To the extent that any individual fails to comply with the terms of this Order and in any way illegally hinders or obstructs, or attempts to hinder or obstruct, any law- enforcement officer acting in his or her official capacity to enforce the terms of this Order, such individual shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than $50 nor more than $500 or confined in jail not more than one year, or both fined and confined pursuant to Chapter 61, Article 5, Section 17 of the West Virginia Code.[21]

Although Executive Order No. 39-20 terminated E.O. 14-20, it shows the perceived enforcement powers which the Governor believes he wields, should he so choose, which have been utilized by one county to arrest a 72-year-old barber for failure to comply with the closure of his business under the "Stay at Home Order."[22]

<u>CONCLUSION</u>

86.    Plaintiffs are entitled to a declaration of unconstitutionality of the "Stay at Home Order" and the so-called "mask mandate" and its application to the plaintiffs as alleged herein, as well as ongoing threatened punitive sanctions through the Putnam County Commission health officials.

87.    Defendants abused the authority of their respective offices and, while acting under color of law and with knowledge of the plaintiffs' established rights, used their offices to violate plaintiffs' constitutional rights, privileges and/or immunities secured by the Constitution and other laws.

88.    Thus, under 42 U.S.C 1983, Plaintiffs seek declaratory relief and injunctive relief. Pursuant to 42 U.S.C. 1988, Plaintiffs further seek their reasonable attorney fees and costs.

---

[21] Obstructing an officer.

[22] Winerd "Les" Jenkins was arrested for misdemeanor obstruction. See West Virginia Barber's Arrest Shows Failings of the Bureaucratic State, The Federalist, by Jayme Metzgar, June 8, 2020. https://thefederalist.com/2020/06/08/west-virginia-barbers-arrest-shows-failings-bureaucratic-state/?fbclid=IwAR0JB9qfIx1hM7fpIF14k612mPRpPswwzo_fsxL1f9_ZCt5W1XrYiDFCICg

89.     Plaintiffs are also seeking an award of damages against Defendant Snaman and

Defendant Putnam County Commission under 42 U.S.C 1983 and <u>Monell</u>.


<u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiffs demand judgment against the Defendants as prayed for,

including:

A.     That this Court issue a declaration that the challenged "mask mandate" contained

in Executive Order 50-20, as well as its incorporation into the Governor's Reopening Guidelines

for restaurants, as found on the Governor's website, in "The Comeback," is unconstitutional;

B.     That this Court issue a declaration that the challenged "Stay at Home Order"

contained in Executive Order 9-20, as well as its incorporation into the Governor's Reopening

Guidelines for restaurants, as well as its application generally to the plaintiffs as Putnam County

residents, as is also found on the Governor's website, in "The Comeback," is unconstitutional;

C.     That this Court enter permanent injunctive relief to prohibit enforcement of the

challenged orders by the Putnam County Commission or any other state or local officials against

the plaintiffs;

D.     That damages be awarded against Defendant Snaman and the Putnam County

Commission pursuant to Counts One and Two for the violation of the plaintiffs' civil rights, as

well as an award by all defendants for the costs of this action, including reasonable attorney fees

under 42 U.S.C. § 1988; and

E.     Such other and further relief as this Court shall deem just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON COUNTS ONE AND TWO**

> ANDREW STEWART, ASHLEY STEWART,
> DINNER'S READY, INC., a West Virginia
> corporation, d/b/a BRIDGE CAFE & BISTRO,
> By Counsel

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

for the Plaintiff

## **VERIFICATION**

STATE OF WEST VIRGINIA

COUNTY OF PUTNAM, TO WIT:


I, ASHLEY STEWART, after first being duly sworn upon oath, state that I am a

Plaintiff in the attached and foregoing VERIFIED COMPLAINT SEEKING DAMAGES

UNDER 42 U.S.C. 1983 AND DECLARATORY RELIEF AND INJUNCTION, that I

have read the document, and that the facts and allegations contained therein are true and

correct, except insofar as they are stated to be on information and belief, and that insofar

as they are stated to be on information and belief, I believe them to be true.


_____

Individually and on behalf of Dinner's Ready, Inc.


Taken, sworn to, and subscribed before me on this ___15th___ day of September,

2020.


*Sharon Crook*

```
OFFICIAL SEAL
Notary Public, State Of West Virginia
SHARON CROOK
3718 Cambridge Drive
Hurricane, WV 25526
My Commission Expires August 26, 2023
```

My commission expires *Aug. 26 2023*

## **VERIFICATION**

STATE OF WEST VIRGINIA

COUNTY OF PUTNAM, TO WIT:


    I, ANDREW STEWART, after first being duly sworn upon oath, state that I am a

Plaintiff in the attached and foregoing VERIFIED COMPLAINT SEEKING DAMAGES

UNDER 42 U.S.C. 1983 AND DECLARATORY RELIEF AND INJUNCTION, that I

have read the document, and that the facts and allegations contained therein are true and

correct, except insofar as they are stated to be on information and belief, and that insofar

as they are stated to be on information and belief, I believe them to be true.


                                                     _____

                                      Individually and on behalf of Dinner's Ready, Inc.


    Taken, sworn to, and subscribed before me on this ____15th____ day of September,

2020.


_____

My commission expires ___Aug 26 2023___

OFFICIAL SEAL
Notary Public, State Of West Virginia
SHARON CROOK
3718 Cambridge Drive
Hurricane, WV 25526
My Commission Expires August 26, 2023